Good morning, Your Honor. Michael Nash for Wanda Shorter. We made two arguments, the sufficiency of the evidence regarding counts two, three, and four, which has two subsets, three subsets actually, notice, duplicious, and the actual sufficiency, and then the introduction of what I would term obviously prejudicial evidence in order to distract the jury from the government's lack of proof. Do you think the government should have charged every single trip with allegedly false billing, maybe as a round-trip or maybe as non-ambulatory when it was really ambulatory, as a separate count? I don't know why that would help your client, frankly, but I'm just wondering if that's your position. I think the obvious answer to dupliciousness is you can complain about it ahead of time and they can do exactly what your Honor suggests. But you didn't, and federal rule of criminal procedure has a very strong direction that these kinds of things need to be raised ahead of time. It actually used to say waiver, but now it's it's still quite clear that this is something for the trial court, and your client didn't do that. Correct. So why do we have a problem that's of such a magnitude that we should address it now? She knew what she was defending against. I raise it in terms of the sufficiency of the evidence claim. So you're not complaining about the indictment anymore? Yes, Your Honor, you're correct. Okay, that's helpful. Not to me it isn't, but it's a fact. I raised it because it's indicative of what the government was doing in this case, which is they sloppily charged the case and sloppily proved the case, or attempted to prove it. I don't know what was so sloppy about it. I mean, they had all these various exhibits. Exhibit 20 has all of Empowerment's trip tickets, including those of the two people it focused on, Cook and Cox. There's a lot of discussion at the trial. There's no mystery. Maybe at the beginning, CC and CC is a little crazy, but it becomes quite clear from Exhibits 35 and 40 that we're talking about Cook and Cox, and there's testimony that these are fraudulent billings. There was no testimony that these were fraudulent. The only thing we have is this exhibit. But it's a 1006 summary, right? Are you saying it wasn't disclosed in advance of trial? I would suspect it is, but I'm not sure. And the only obligation besides providing in advance is providing the underlying documentation for the opposing party to examine it. But nobody testified about that. They don't have to. It's a 1006 summary. The obligation... So we just give it to the jury and let the jury decide? No, sir. Do you object to it? Because it's not an accurate summary. But there wasn't... Maybe I'm mistaken, but at trial, no one objected to the 1006 summary. Basically, nobody mentioned either of them, 35 or 40, except for... And the judge admitted it into evidence under 1006. He did. And then nobody mentions it, except in one question. I believe an agent is on the stand, and the prosecutor asks a question. Now, referring to exhibit, it was either 35 or 40, and asks a question that's rather obtuse, has nothing to do about the trip tickets. And then in closing, they didn't use the exhibit? They mentioned it once in final argument, and they only mentioned one. I believe it was 40, not 35. And in answer to Judge Wood's question about exhibit, or I guess it's... You, Judge Connelly, mentioned 20. Those are boxes of trip tickets. 18 is a box of fraudulent billing examples. But nothing is mentioned in the trial about either. But they... But this is evidence before the jury, and just... I'm picking out a random thing. But the government points out that every billing she submits in 2012 represents that she's simultaneously the first and the second passenger in the vehicle. Well, she can't. She can't be both people. I mean, I've sometimes wanted to split myself into two people, and it doesn't work. So the 2013 billings represent she's got an attendant with her, and that isn't what she said. Excuse me. One of the two cocks, or cook, I can't recall, has a broken leg or has had a knee replacement operation and uses an attendant. We have no idea when that was. Was that the time of the billings that are in question? We don't know. Well, we do know that the defendant was directing others to follow a policy of always charging for a wheelchair and an attendant. Period. That's what the testimony was. Well, and we have to accept that? I believe so. And that would be fraud. But it would be fraud. But we don't know... Which of those is the fraud? None. We don't have any idea. Well, we do with respect to the two CCs. Not exactly, Judge. Well, at least one of them. One of them didn't have a broken leg. Well, that's true. But we don't know that these billings, except for this exhibit, about which there was no testimony or no mention. In other words, what good is the testimony, even with the no objection and we just give this to the jury and let them decide and look through a box of fraud billings and a box of seized trip tickets? What is said in final argument by the prosecutor with regard to one of those two exhibits? Let me see. Maybe to go at it a different way. Assuming that we accept that this is a proper 1006 exhibit and that the judge had a basis under the rules of evidence to accept it into evidence, it indicates that one is for Cook, one is for Cox, and even for the broken leg, that the charges were way in excess or beyond any period that there was any evidence she had a broken leg, right? And also the distances, that they were all at the above 20 miles one way. The jury could infer, I think, from this that she was engaged in a fraudulent scheme without pinning down. You're basically arguing the jury has to go through every one of these trips and say, yes, that one was fraudulent, no, that one was okay, yes, that one was fraudulent. I'm not sure under this statute that there's any such requirement. I would disagree to this extent. I think it was incumbent upon the government to prove those particular trips. If they took the time to charge them, to offer some testimony that could be cross-examined, that this is the trip ticket that said 40 miles and two people, and she didn't have, when Ms. Cook or Ms. Cox took the trip, she didn't have an attendant, and it wasn't 40 miles, and somebody from Indiana Medicare to testify, we received a billing and we paid that bill. None of that testimony was offered by the government. They tend to get around it by creating this summary exhibit, just as the court has pointed out, and giving it to the jury with two boxes, none of which are mentioned in the trial. Well, the government on page 30, I think you're underestimating its evidence. Page 30 of? Page 30 of the government's brief. Trial counsel concedes, it states, that there's evidence that there were billings done without Cox and Cook's authorization and using their Medicaid identification number. That concession was well-founded. Exhibits 35 and 40 provide the evidence of fraudulent billings, and then it says both Cox and Cook stated that they did not ride in a wheelchair during the relevant period, and then there's a mention of one week at the end of 2013, but that doesn't contradict at all the idea that there's no wheelchair in June and August of 2013, or the fact that during the relevant periods that they were both in wheelchairs. So I'm just picking this out as something, and then the government does go on at page 32 to talk about exhibit 18, which, again, is quite specific. But 18 is a box of fraud billings examples. They attach one to their brief, the first one of that exhibit. Well, why is that bad? I mean, the government proves these things by individual instances, and if their medical record's saying she's a no-show, Cox this is, and yet Empowerment bills both transports as round trips, that sounds like fraud to me. I mean, the jury surely could see that as fraud. First of all, neither Cox nor Cook, whichever one, had the broken, the leg problem, and used an attendant. Only at the end of 2013, though. They both say not before that. She doesn't say what time that occurred. She just says, yes, at one time I had a knee operation and I used an attendant. I don't believe there's any reference specifically to the time. Well, Cox specifically says she needed a wheelchair for one week at the end of 2013, right? I think, right. And she never needed an attendant. So looking at that summary, they're all fraud to her. I think the government has to put on a witness. It just did. They put on Cox, and she said it wasn't true. She didn't use it. And the jury apparently believed her. If you would like to say a word about the other evidence, you're running into rebuttal time, but I'll let you quickly touch on that. The cruises and the freezing weather and the terrible condition of the equipment and so on. There were 12 client witnesses that testified, notwithstanding the undercover agents. Ten of them were asked questions about, were there bounce checks? Were the vans in good shape? Were people late? One woman was stranded in a blizzard. There's no reason for those questions. And as much as the government might try to justify them, they're there for only one reason, and that's to distract the jury from the lack of proof as to the fraud. They were irrelevant. They were very prejudicial, and it was wrong. And unless this court is going to tell the government that they can't do this, they're going to do it in the future. Mr. Nash, isn't it a real challenge here that Exhibits 35 and 40 weren't objected to? Well, my position would be much stronger if that were the case. I suspect if you had been the trial lawyer, that would have been the case. I think so, Judge. All right. If you want to save a minute for rebuttal. Thank you. Mr. Hoyland. Good morning, Your Honors. May it please the Court. I was prepared to address four issues, but I guess we're down to two issues. I'd like to just jump in with some of these factual inquiries that this Court was asking Ms. Shorter about. Judge Conley, as to your points, Ms. Cox, who's the individual who had the broken leg at the end of 2013, testifies at page 57 in the first day of trial that she never had an attendant, not even during that period. So there's no evidence that she ever had an attendant. Ms. Shorter argues that Exhibit 18 was a voluminous box and there was no testimony about that. That's not right, Your Honors. The government goes through with Agent Swetland, and I believe that's how you pronounce her name, in the third day of trial, pages 43 to 55, goes through various exhibits with her, various trip tickets, and as relevant to these counts, it goes through Mrs. Cox's June 10th ticket on page 47 of the third day of trial, confirms that the ticket says it was canceled, and this is page 13, excuse me, of our short appendix, confirms it's canceled, asks when it was billed, confirms it was billed in August of 2013. The government also went through other specific trip tickets with witnesses. In the second day of trial, pages 200 to 203, the government goes through with Agent Weston, as it relates to Ms. Cox, her June 5th, 2013 ticket, her June 10th, 2013 ticket, her June 19th, 2013 ticket, and gets testimony about those, talks about how the ticket, for example, on June 19th says she didn't come out. So any billing, as it relates to her on that day, was going to be fraudulent. She didn't use empowerment that day. The June 10th ticket, we included that in our short appendix. It has canceled written on it. We went through specific exhibits with these witnesses and got them to testify about that, as it relates to Ms. Cook. But the most damaging proof was that you had the sweeping practice of charging for a wheelchair in attendance. That's correct, Your Honor. And that was the heart of the government's case, that this wasn't just some error on individual cases, it was sweeping. And yet the evidence of the sweeping nature was Exhibits 35 and 40. Right? Because those were the summaries of all of these charges that had no basis. That's certainly among the evidence in this case. Well, is there other evidence of the kind of sweeping nature of the fraud here? Well, I think as it relates to the aggravated identity thefts or the Medicare fraud, or Medicaid fraud, excuse me. That's a fair point, as it relates to the Medicaid fraud. As it relates to the Medicaid fraud, I think the undercover agent's testimony is actually, to me, that was particularly compelling in this case. They call in September of 2013 and schedule appointments, and then you see evidence and hear evidence that they actually were billed for taking trips in May. So what's the point of the summaries? What's the point of the summaries? I mean, they were offered as evidence of a lengthy group of fraud that makes clear this was not just a single incident. That's correct, Your Honor. The point of the summaries was to go. And yet it was never really explained to the jury. Well, Your Honor, it's page 157 in the second day of trial. The government talks about how Exhibit 40 is the summaries of billings of Cassandra Cook. To answer Your Honor's question. Certainly it was referred to, but the government is now pointing as evidence that this happened over a long period of time. That was really not an argument that was made to the jury. Well, Your Honor, it also wasn't contested, and I think that's an important point in this case. It's probably important for an appellate court, since we're required to look for evidence supporting the jury's verdict, but it's a little bit troubling that it wasn't really explained to the jury. Your Honor, I'm not going to stand up here and argue this is a textbook case of going through all of these exhibits. Yeah. It could have been done better, certainly on the cold record, but what's also happening. Or even in closing would have been a good time to spend a little more time with it. Sure, Your Honor, but what's also happening simultaneously is there are exhibits very similar to 35 and 40 as it relates to each of the Medicaid participants, and the government is going through some of those with some of the agents. At one point, the government shows, I believe it's Maldonado, the summary of her billings, and it's clear that she doesn't really know what they mean, and I don't know that there's any value of showing that to the particular Medicaid participant. My guess is two of the counts relate specifically to Cox and Cook, and so do these exhibits, and that, as you say, in an ideal world, it would have been explained better to the jury and given us greater comfort that, indeed, the jury relied on those in the way that is now suggested by them or is being challenged by the defendant. Sure, and I understand Your Honor's points. Your Honor did ask about where it's referenced in the closing, and I will say on page 118 of the fourth day of trial, that's the closing, and the government says, and you have the records including Exhibit 40 for Cassandra Cook and Chatika Cox, excuse me. It admittedly doesn't reference Exhibit 35 by number as to Ms. Cox, but I think what's also important in the corollary is look at defense's closing as it relates to these aggravated identity theft counts, and it's three sentences. They don't argue that one particular billing was different than another, and far be it from me to put myself in the position of a defense attorney in this case, but I think the evidence that someone in empowerment is submitting fraudulent billings is just overwhelming, and you're not going to get a whole lot of traction if you argue any particular billing, and I don't think there was a legitimate defense as to any particular billing. Mr. Whalen, let me ask you a little bit about the government's approach on some of the evidence in direct. Yes, Your Honor. How about Shorter taking her whole family on a cruise? Sure. I mean, suppose she didn't make any contributions to charity for a decade. Would you think you could put that in case in chief? No, Your Honor, because that wouldn't explain where the money was going that empowerment was receiving. Empowerment's receiving $1.4 million. No, I know that. I know that. But what? Well, reverse it then. What if the evidence was that she gave to charity? That would be a legitimate use. I think defense counsel would have been able to bring that in. Well, could the government bring it in as a place that's where she spends a lot of money? In an attempt to develop a favorable impression in the community? I think under the state. These are things you brought up in the case in chief. That's correct, Your Honor. As to the cruise. How about a new car? Your Honor, that, again, explains where the money was going that Ms. Shorter received. And I think what's important to know is. . . How about her clothing allowance? Would that be okay? Suppose she bought a mink coat. Do you think government could bring that in in the case in chief? Your Honor, I understand this court finds some of these questions. . . Or might believe some of these questions. Yeah, I'm just raising it. I'm raising it in the context of where the government, as you say, had an overwhelming case. . . in connection with the documents, the documentary evidence. And, as you point out, some of the testimony. But it's a little concerning to me when the government kind of gills the lily in the case in chief. . . And says this is inherently a bad person apart from the conduct charged. And I understand the court's concern that it might be objectionable. But the fact is it wasn't objected to. No, I. . . So. . . You're certainly on solid ground there. Because this case is a little challenging when one reviews it on the quality of the defense. Well, Your Honor. . . Again, I don't want to step into defense counsel's shoes. But I think as it relates to some of this testimony. . . Empowerment missing pickups. Defense's theory of the case. They concede in their opening and closing that Empowerment received money it shouldn't have. And it submitted fraudulent bills. So their theory of the case was twofold. It was one, that Ms. Shorter saw a need. And she tried to fill it. And it just spiraled out of control. That she wasn't a good business manager. Now, I'm not advocating that we admitted the evidence to help the defense. Because we certainly didn't. But I think there are two ways you can spin something like Empowerment didn't pick up a particular patient. It would have spun a lot better in rebuttal in response to a specific testimony or argument. Well, Your Honor. . . I think our theory of the case is pretty clear in opening argument. And that's the way this case was tried. I understand the Court's point about that. But as it relates to specific opening. . . What counsel says is. . . And this is pages 17 and 18 of the closing. The AUSA is going to put on evidence that Ms. Shorter failed to keep good records. And we don't dispute that. The records are now what they should have been. And we're not going to dispute the fact that there were some rules that she didn't follow. What this case is really about is not whether Wanda Shorter followed the rules. Or whether Wanda Shorter kept the records that she was supposed to keep. But whether she willfully and intentionally and fraudulently, knowingly and purposely. . . Billed for things that she knew she wasn't entitled to. And then he goes on to say. . . The real question that you're going to have to answer is. . . Was this purposeful? Was this intentional? Was this deliberate? Was this fraudulent? That's the only issue in this case. Her intent to defraud. I certainly understand the Court's points about some of these questions. I would say that you could also, as defense counsel, spin them to support that theory of. . . She's in over her head.  But I do appreciate the Court's concerns. Ultimately, because we are here on plain error review. . . I don't think any of these questions rose to the level of plainly erroneous. . . Where the judge should have stepped in. And certainly as it relates to harmful prejudice. . . I don't think there's a legitimate argument to that. Unless this Court has any further questions. . . We would ask that you affirm the judgment and convictions. All right. Seeing none. Thank you very much. Mr. Nash, anything further? The point is not how the money was spent. How the money was received. And that evidence was clearly prejudicial. Could not have been viewed otherwise. And I differ with the prosecutor in this respect. I think the District Court should have said something. Even if defense counsel did not. The second point is. . . The government says. . . Your Honor, Judge Connolly said. . . Referred to the massive fraud. And the prosecutor retorts. . . That someone at Empowerment was billing fraudulently. The fact is. . . There was no proof that Wanda Shorter did that billing. Notwithstanding the generic testimony. . . About how various people were taught to do it. There were explanations of why. There were wheelchairs. Somebody said. . . If they had to be wheeled into the cart. . . Or wheeled up to the van. . . They thought that's a wheelchair patient. That's the testimony at the trial. Other than that. . . There was no theory of defense. In the sense of. . . A theory of defense that she was being altruistic. She was a business person. So the defense counsel said. . . That she was trying to fill a need. She was. And she was a bad bookkeeper. Thank you. All right. Thank you very much, Mr. Nash. And you were appointed, I believe. I was. We appreciate your service to the court and to your client. Thank you. And thanks as well to the Assistant U.S. Attorney. We will take the case under advisement.